IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| STORMWATER STRUCTURES, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-09-2755 |
| | § | |
| PLATIPUS ANCHORS, INC., | § | |
| PLATIPUS ANCHORS, LTD., and | § | |
| D. MILLER & ASSOCIATES, PA, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

StormWater Structures, Inc. ("StormWater") brings this action
against Platipus Anchors, Inc. ("Platipus"), Platipus Anchors,
Ltd., and D. Miller & Associates, PA ("D. Miller") alleging
multiple causes of action relating to the collapse of the slopes of
a detention pond in Houston, Texas.  Pending before the court is
Defendant D. Miller's Motion to Dismiss for Lack of Personal
Jurisdiction (Docket Entry No. 4).  For the reasons explained
below, the court will deny D. Miller's motion.

## I.  Factual and Procedural Background

This action arises out of the collapse of the slopes of a
detention pond in Houston, Texas, that StormWater helped
reconfigure using earth anchors supplied by Platipus and an
engineering design created by D. Miller.  StormWater is a Texas
corporation with its principal place of business in Houston,

Texas.[1]  StormWater provides stormwater management solutions in the
Houston area.    Platipus Anchors, Inc. is a North Carolina
Corporation with its principal place of business in Raleigh,
North Carolina.[2]  Platipus Anchors, Inc. is the North American
affiliate of Platipus Anchors, Ltd., a private Limited Company in
the United Kingdom with its principal place of business in the
United Kingdom.[3]  Platipus and Platipus Anchors, Ltd. provide
earth-anchoring systems.    D. Miller is a North Carolina
professional association with its principal place of business in
Morrisville, North Carolina.[4]  D. Miller provides consulting
services in geotechnical engineering and other fields.  The court's
jurisdiction over this action is based on the diversity of the
parties.

**A.    StormWater's Account**

StormWater has produced an affidavit from its President,
John Randall Wilkins, describing StormWater's account of the events
leading up to this action:

> 2.  .  .  .  This dispute arises out of the
> reconstruction of a detention pond located at the
> Beltway 8 Center/Food Town Shopping Center . . . ("the
> Project").  In September 2007, Construction EcoServices
> II, Inc. ("CES") began working on the Project for the

---

[1]Plaintiffs' Original Complaint, Docket Entry No. 1, ¶ 2.

[2]Id. ¶ 3.

[3]Id. ¶ 4.

[4]Id. ¶ 5.

owner of the property to redesign and reconstruct the
detention pond to increase the volume of water it can
hold.  CES hired StormWater to provide the design and
materials to change the slope angle of the banks of the
pond from a 3-to-1 ratio to a 1-to-1 ratio.

      3.   To accomplish this task, StormWater entered
into an agreement to purchase an engineered design for
the Project and a set of earth anchors to support the
banks from Platipus Anchors, Inc. ("Platipus"). . .
Under the terms of the Agreement, the Engineered Design
had to be stamped by an engineer licensed in the State of
Texas.[5]

In support of this statement StormWater has produced a purchase

order dated January 7, 2008, which contains a line item of $4,000

for a "stamped cross section by P.E. licensed in Texas."[6]  The

vendor listed on the purchase order is Frank Milchuck of Platipus

Anchors.  D. Miller is not mentioned on the purchase order.

Wilkins continues:

      4.   Platipus hired D. Miller to prepare and provide
the Engineered Design for the Project in September of
2007 . . . To assist with D. Miller's preparation of the
design, I personally participated in multiple telephone
conversations with Mr. Kumar Turlapati, one of
D. Miller's engineers, during which I provided the
Project specifications including the dimensions of the
detention pond.  There was a problem, however, because at
that time no engineer working for D. Miller had a current
Texas license. . .[7]

_____

[5]Affidavit of John Randall Wilkins, Exhibit A to Plaintiffs'
Response to Defendant D. Miller's Motion to Dismiss for Lack of
Personal Jurisdiction ("Plaintiffs' Response"), Docket Entry
No. 10, ¶¶ 2-3.

[6]Purchase Order, Exhibit B to Plaintiffs' Response, Docket
Entry No. 10.

[7]Affidavit of John Randall Wilkins, Exhibit A to Plaintiffs'
Response, Docket Entry No. 10, ¶ 4.

StormWater has provided e-mail correspondence between Wilkins and
Platipus' Frank Milchuck in which Wilkins states, "I . . . need to
know what the cost of a final design with a Texas stamp is."[8]
Milchuck responds that "[t]he preliminary design will be less than
$1,000.  They are working on the TX license so it can be stamped.
If they can stamp it then I will discuss with you the costs . . ."[9]
The Wilkins affidavit continues:

>       5.  I explained to Platipus that the Engineered
> Design had to be stamped by an engineer licensed in
> Texas.  As a result, D. Miller had one of its engineers
> either become licensed in Texas or renew a Texas license
> so D. Miller could legally stamp the Engineered Design.
> I have since confirmed on the Texas Board of Professional
> Engineer's website that the engineer that stamped the
> Engineered Design, Mr. Kevin P. Morrow, License
> No. 91912, works for D. Miller and is in fact licensed in
> Texas. . .[10]

StormWater has provided a screenshot from the website for the Texas
Board of Professional Engineers that shows that Kevin Morrow has
been licensed since June 13, 2003.[11]  The website lists an address
for Morrow in Raleigh, North Carolina.  Wilkins continues:

>       6.  In November 2007, D. Miller completed the
> Engineered Design with a Texas stamp and sent it to
> Platipus to be forwarded on to StormWater.  A true

---

[8]E-mail correspondence between Randy Wilkins and Frank
Milchuck, October 1, 2007, Exhibit E to Plaintiffs' Response,
Docket Entry No. 10, p. 2.

[9]Id. at 1.

[10]Affidavit of John Randall Wilkins, Exhibit A to Plaintiffs'
Response, Docket Entry No. 10, ¶ 5.

[11]Screenshot, Exhibit F to Plaintiffs' Response, Docket Entry
No. 10.

and correct copy of the Engineered Design is
attached to the Response as Exhibit D. . . .[12]

The identified exhibit contains two pages of engineering designs
preceded by a letter to Milchuck signed by D. Miller's Phanikumar
Turlapati and Kevin Morrow, who are both identified as Geotechnical
engineers.[13]  The letter is dated November 14, 2007.  The letter
states that the analysis is "[b]ased on the verbal information
provided to us by Mr. Randy Wilkins of Stormwater Structures."  The
first and last page bear a stamp stating "Kevin Morrow – State of
Texas – Professional Engineer" and providing the license number
91912.  Wilkins continues:

> 6.   . . . StormWater submitted the Engineered
> Design to CES who relied on it to stabilize the
> reconstructed banks of the detention pond.  CES completed
> the project pursuant to the specifications in the
> Engineered Design in April 2008.  Four months later, in
> late August 2008, the banks of the detention pond
> collapsed under heavy rains causing severe erosion at the
> base of the adjacent buildings. . .
>
> 7.   CES and StormWater requested that Platipus and
> D. Miller assist with an investigation into the cause of
> the collapse.  Both defendants, however, refused to
> participate and StormWater was left to determine the
> cause without them.  In January 2009, StormWater hired
> Tolunay-Wong Engineers, Inc. ("Tolunay-Wong") to perform
> a geotechnical study of the slope failure at the Project.
> After completing its study, Tolunay-Wong prepared and
> produced a report dated January 13, 2009 . . .
>
> 8.   In the report Tolunay-Wong opined that the main
> causes of the slope failure were "the presence of highly

--------

[12]Affidavit of John Randall Wilkins, Exhibit A to Plaintiffs'
Response, Docket Entry No. 10, ¶ 6.

[13]Letter from Phanikumar Turlapati and Kevin Morrow to Frank
Milchuck, November 14, 2007, Exhibit D to Plaintiffs' Response,
Docket Entry No. 10.

expansive soils" and "the presence of insufficient amount
of anchors to reinforce the relatively steep slope.["]
Since then, StormWater has spent $283,875.43 to have the
detention pond repaired.[14]

The parties appear to be in general agreement about the basic
factual outline of the events leading up to this action:
StormWater contracted with Platipus to provide earth anchors and an
engineered design for the project; Platipus contracted with
D. Miller to provide the design, which Platipus then forwarded to
StormWater; CES reconfigured the detention pond using the Platipus
Anchors procured by StormWater; some months later the walls of the
pond collapsed.   The defendants dispute certain facts and
characterizations presented in StormWater's account.   For present
purposes the only relevant dispute is over the extent of
D. Miller's contacts with Texas.

**B.   D. Miller's Account of its Contacts with Texas**

D. Miller disputes some statements in Wilkins' affidavit.
D. Miller has provided an affidavit from its Business Manager,
Robert Auld, concerning D. Miller's contacts with Texas.[15]   Auld
asserts that D. Miller does not own, operate, or maintain any
operations or offices in Texas, nor does it employ any individuals,
advertise for business, maintain agents or representatives, or pay

---

[14]Affidavit of John Randall Wilkins, Exhibit A to Plaintiffs'
Response, Docket Entry No. 10, ¶¶ 6-8.

[15]Affidavit of Robert Auld, Exhibit A to Defendant D. Miller's
Motion to Dismiss for Lack of Personal Jurisdiction ("D. Miller's
Motion"), Docket Entry No. 4.

any taxes in Texas.[16]   Regarding the events giving rise to this action, Auld states:

> 11.   D. Miller has not entered into any contracts with the Plaintiff in the State of Texas;
>
> 12.   The only connection that D. Miller has ever had with Texas involves D. Miller entering into an agreement, in North Carolina, with Platipus Anchors, Inc. ("Platipus"), a North Carolina corporation, to prepare a global stability analysis of a pre-existing slope in Texas and provide a design for anchor installation;
>
> 13.   D. Miller never traveled to Texas for the preparation of the global stability analysis and design for anchor installation;
>
> 14.   The analysis and design for anchor installation was prepared in North Carolina based on information received from Platipus;
>
> 15.   In November 2007, Platipus received the final design from D. Miller at D. Miller's office.[17]

D. Miller has provided a series of e-mails between Platipus' Milchuck and D. Miller's Turlapati, which D. Miller contends shows that "D. Miller received all of its instructions for the preparation of the global stability analysis from Frank Milchuck."[18] The e-mail series, which dates from September 27 to October 1, 2007, shows communication between Milchuck and Turlapati concerning various financial and technical aspects of the project, but also

---

[16]Id. ¶¶ 3-9.

[17]Id. ¶¶ 11-15.

[18]Defendant D. Miller's Reply to Plaintiff's Response to D. Miller's Motion to Dismiss for Lack of Personal Jurisdiction ("D. Miller's Reply"), Docket Entry No. 14, p. 3.

includes a message in which StormWater's Wilkins forwards technical specifications of the project site to both Milchuck and Turlapati.[19] Wilkins' message states:

> Frank/Kumar
> Attached are the geotech and the existing pond configuration.  We propose to take the existing side slopes from the current 3:1 to 1:1 to accommodate the needed additional volume required by additional development on the site.  Please advise which anchors should be used and cost to provide a design with a Texas PE.[20]

The e-mails suggest that Turlapati corresponded primarily with Milchuck but also received direct communications and technical information by e-mail from Wilkins on at least one occasion.

D. Miller also contests Wilkins' statement that "I personally participated in multiple telephone conversations with Mr. Kumar Turlapati."[21]  D. Miller has provided an affidavit from Turlapati concerning the extent of his conversations with Wilkins:

> 5.   I informed Frank Milchuck, Platipus' employee, in most likely a telephone conversation that I needed to contact Randy Wilkins ("Wilkins") for technical information;
>
> 6.   Other than speaking with Wilkins for less than three minutes, I did not have any other conversations with anyone from StormWater regarding the global stability analysis.[22]

_____

[19]E-mails between Frank Milchuck and Kumar Turlapati, Exhibit A to D. Miller's Reply, Docket Entry No. 14.

[20]Id. at 2.

[21]Affidavit of John Randall Wilkins, Exhibit A to Plaintiffs' Response, Docket Entry No. 10, ¶ 4.

[22]Affidavit of Phanikumar Turlapati, Exhibit B to D. Miller's Reply, Docket Entry No. 14, ¶¶ 5-6.

D. Miller also contests the statement in Wilkins' affidavit that "D. Miller had one of its engineers either become licensed in Texas or renew a Texas license so D. Miller could legally stamp the Engineered Design."[23]   D. Miller has provided an affidavit from Morrow, the engineer whose stamp appears on the engineered design, that states, "I received my license in June 2003 and it has never been inactive."[24]   D. Miller does not dispute that it put the stamp of a licensed Texas Professional Engineer on the engineered design; instead, it disputes whether it took affirmative steps to get Morrow licensed in Texas in order to stamp the design in question.

## C.   Platipus' Account

Platipus and Platipus Anchors, Ltd., which oppose D. Miller's motion to dismiss, have provided statements that generally support Wilkins' account of the communications between StormWater and D. Miller.   Platipus states in its Answer that "Platipus Anchors, Ltd. placed StormWater in direct communication with D. Miller & Associates for the purpose of having D. Miller & Associates provide a stamped design for Stormwater's review."[25]   Platipus Anchors, Ltd. states in its Answer that:

---

[23]Affidavit of John Randall Wilkins, Exhibit A to Plaintiffs' Response, Docket Entry No. 10, ¶ 5.

[24]Affidavit of Kevin Morrow, Exhibit E to D. Miller's Reply, Docket Entry No. 14, ¶ 6.

[25]Defendant Platipus Anchor, Inc.'s Original Answer and Original Counter-Claim, Docket Entry No. 6, ¶ 11.

D. Miller further entered into direct communications with Stormwater to gather the necessary information needed to prepare the Global Stability Analysis for the Project. Through these direct communications, Randy Wilkens [sic], Stormwater's President, provided D. Miller with "verbal information" about the Project, as well as a Geotechnical Report prepared by Kenall Inc. on or about June 28, 2006.[26]

## D.    Procedural Background

StormWater brought this action against Platipus, Platipus Anchors, Ltd., and D. Miller on August 26, 2009, seeking damages from Platipus for breach of contract, breach of warranty, violation of the Deceptive Trade Practices Act, negligent misrepresentation, and negligence; and it seeks damages from D. Miller for negligence (Docket Entry No. 1).    On October 12, 2009, D. Miller filed a Motion to Dismiss for Lack of Personal Jurisdiction (Docket Entry No. 4), arguing that D. Miller should be dismissed pursuant to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(3) or, alternatively, that this action should be transferred to the United States District Court for the District of North Carolina. StormWater has filed a Response opposing D. Miller's motion (Docket Entry No. 10).    Platipus Anchors, Ltd., which also opposes D. Miller's motion, has filed cross-claims against D. Miller for negligence and breach of contract (Docket Entry No. 9).

---

[26]Defendant Platipus Anchor, Ltd.'s Original Answer, Counter-Claim, and Cross-Claim, Docket Entry No. 9, p. 13.

## II.  D. Miller's Rule 12(b)(2) Motion

### A.  Standard of Review

When a foreign defendant moves to dismiss for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2), "the plaintiff 'bears the burden of establishing the district court's jurisdiction over the defendant.'" <u>Quick Technologies, Inc. v. Sage Group PLC</u>, 313 F.3d 338, 343 (5th Cir. 2002), <u>cert. denied</u>, 124 S.Ct. 66 (2003) (quoting <u>Mink v. AAAA Development LLC</u>, 190 F.3d 333, 335 (5th Cir. 1999)). "When the district court rules on a motion to dismiss for lack of personal jurisdiction 'without an evidentiary hearing, the plaintiff may bear his burden by presenting a prima facie case that personal jurisdiction is proper.'" <u>Id.</u> "In making its determination, the district court may consider the contents of the record before the court at the time of the motion, including 'affidavits, interrogatories, depositions, oral testimony, or any combination of the recognized methods of discovery.'" <u>Id.</u> at 344. The court must accept as true uncontroverted allegations in the plaintiff's complaint and must resolve factual conflicts in the plaintiff's favor, but need not credit conclusory allegations even if uncontroverted. <u>See</u> <u>Panda Brandywine Corp. v. Potomac Electric Power Co.</u>, 253 F.3d 865, 869 (5th Cir. 2001). "Absent any dispute as to the relevant facts . . . whether personal jurisdiction may be exercised over a nonresident defendant is a question of law." <u>Ruston Gas Turbines, Inc. v. Donaldson Co., Inc.</u>, 9 F.3d 415, 418 (5th Cir. 1993).

-11-

**B.    Applicable Law – Personal Jurisdiction**

Exercise of personal jurisdiction over a nonresident defendant comports with federal due process guarantees when the nonresident defendant has established minimum contacts with the forum state, and the exercise of jurisdiction "does not offend 'traditional notions of fair play and substantial justice.'"  International Shoe Co. v. State of Washington, Office of Unemployment Compensation and Placement, 66 S.Ct. 154, 158 (1945).   Once a plaintiff satisfies these two requirements a presumption arises that jurisdiction is reasonable, and the burden of proof and persuasion shifts to the defendant opposing jurisdiction to present "a compelling case that the presence of some other considerations would render jurisdiction unreasonable."  Burger King Corp. v. Rudzewicz, 105 S.Ct. 2174, 2185 (1985).

1.    Jurisdiction over State-Law Claims

For claims arising under state law, federal courts "may assert [personal] jurisdiction if:  (1) the state's long-arm statute applies, as interpreted by the state's courts; and (2) if due process is satisfied under the [F]ourteenth [A]mendment to the United States Constitution."  Johnston v. Multidata Systems International Corp., 523 F.3d 602, 609 (5th Cir. 2008).  The Texas long-arm statute authorizes suit against nonresidents "[i]n an action arising from the nonresident's business in this state."  TEX. CIV. PRAC. & REM. CODE § 17.043.   The Texas Supreme Court has

-12-

stated that the long-arm statute's "broad doing-business language allows the statute to 'reach as far as the federal constitutional requirements of due process will allow.'"  See Moki Mac River Expeditions v. Drugg, 221 S.W.3d 569, 575 (Tex. 2007) (quoting Guardian Royal Exchange Assurance, Ltd. v. English China Clays, P.L.C., 815 S.W.2d 223, 226 (Tex. 1991)).  "Because the Texas long-arm statute extends to the limits of federal due process, the two-step inquiry collapses into one federal due process analysis." Johnston, 523 F.3d at 609.

    2.  Minimum Contacts

"There are two types of 'minimum contacts':  those that give rise to specific personal jurisdiction and those that give rise to general personal jurisdiction." Lewis v. Fresne, 252 F.3d 352, 358 (5th Cir. 2001).  StormWater's allegations are based on the assertion of specific, not general, jurisdiction.  A court may exercise specific jurisdiction over a nonresident defendant if the lawsuit arises from or relates to the defendant's contact with the forum state.  ICEE Distributors, Inc. v. J & J Snack Foods Corp., 325 F.3d 586, 591 (5th Cir. 2003).  Specific jurisdiction exists where a defendant "purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws." Burger King, 105 S.Ct. at 2183.  Contacts are sufficient to justify the exercise of personal jurisdiction if the defendant "should reasonably anticipate being

-13-

haled into court" in the forum state. World-Wide Volkswagen Corp. v. Woodson, 100 S.Ct. 559, 567 (1980). "A single purposeful contact may confer jurisdiction." Luv N' care, Ltd. v. Insta-Mix, Inc., 438 F.3d 465, 470 n.3 (5th Cir. 2006). Additionally, "[w]hen a nonresident defendant commits a tort within the state, or an act outside the state that causes tortious injury within the state, that tortious conduct amounts to sufficient minimum contacts with the state . . ." Guidry v. U.S. Tobacco Co., Inc., 188 F.3d 619, 628 (5th Cir. 1999).

The Texas Supreme Court has explained that there are three parts to a purposeful availment inquiry. First, only the defendant's contacts with the forum are relevant, not the unilateral activity of another party or a third person. Second, the contacts relied upon must be purposeful rather than random, fortuitous, or attenuated. Finally, the defendant must seek some benefit, advantage, or profit by availing itself of the jurisdiction. Moki Mac, 221 S.W.3d at 575 (citing Burger King, 105 S.Ct. at 2182).

3.   Traditional Notions of Fair Play and Substantial Justice

In order to establish personal jurisdiction over D. Miller, StormWater must also show that the exercise of personal jurisdiction would not offend "traditional notions of fair play and substantial justice." Asahi Metal Indus. Co. v. Superior Court of Cal., 107 S.Ct. 1026, 1033 (1987). In evaluating the reasonable-ness of the exercise of jurisdiction over the defendant, the court

-14-

should consider several factors:  (1) the burden on the defendant, (2) the interests of the forum state, (3) the plaintiff's interest in obtaining relief, (4) the interest of the interstate judicial system in obtaining the most efficient resolution of the controversy, and (5) the interest of the states in furthering substantive social policies.  <u>Id.</u> (citing <u>World-Wide Volkswagen</u>, 100 S.Ct. at 564).

## C.   Analysis

D. Miller argues that this court lacks personal jurisdiction over it because D. Miller does not have minimum contacts with Texas.  StormWater argues that personal jurisdiction exists because "D. Miller has purposefully availed itself of the benefits and protections of the laws of Texas by using a licensed Texas engineer to prepare and stamp the defective design that forms the basis of StormWater's claims in this lawsuit."[27]

Because the Texas long-arm statute extends to the limits of federal due process, this court can exercise personal jurisdiction over D. Miller if federal due process analysis supports it.  <u>See</u> <u>Johnston</u>, 523 F.3d at 609.  To establish personal jurisdiction, StormWater or Platipus Anchors, Ltd. must present a <u>prima facie</u> case that D. Miller established minimum contacts with Texas, and that the exercise of jurisdiction does not offend traditional

---

[27]Plaintiffs' Response, Docket Entry No. 10, p. 1.

notions of fair play and substantial justice. See Quick
Technologies, 313 F.3d at 343.

    1.  D. Miller's Contacts with Texas

    It is undisputed that D. Miller prepared a design for a civil
engineering project in Houston and that D. Miller stamped the
design with the official stamp of a licensed Texas Professional
Engineer.[28]  It is undisputed that D. Miller was aware that the
design was for a project in Texas and that StormWater needed an
official stamp on the design.[29]  It is also undisputed that
D. Miller's engineer communicated about the project, albeit
briefly, with Wilkins by both phone and e-mail.[30]

    D. Miller disputes the extent of the communications it had
with StormWater, and denies that it took steps to get Morrow
licensed in Texas in order to stamp the design.  The standard of
review requires this court to resolve factual conflicts in the
plaintiff's favor.  See Panda Brandywine, 253 F.3d at 869.  Even if
the court accepted all of D. Miller's factual allegations, however,
it would still find that D. Miller had minimum contacts with Texas.

_____

    [28]Letter from Phanikumar Turlapati and Kevin Morrow to Frank
Milchuck, November 14, 2007, Exhibit D to Plaintiffs' Response,
Docket Entry No. 10.

    [29]Affidavit of Kevin Morrow, Exhibit E to D. Miller's Reply,
Docket Entry No. 14, ¶¶ 3-4 ("Platipus informed D. Miller that the
design needed a Texas seal").

    [30]E-mails between Frank Milchuck and Kumar Turlapati, Exhibit A
to D. Miller's Reply, Docket Entry No. 14, pp. 1-2; Affidavit of
Phanikumar Turlapati, Exhibit B to D. Miller's Reply, Docket Entry
No. 14, ¶¶ 5-6.

The central inquiry is whether D. Miller "purposefully availed itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws." See Burger King, 105 S.Ct. at 2183.  The court concludes that D. Miller purposely availed itself of the privileges of doing business in Texas.  It created an engineering design that was specific to a particular location in Texas.  It stamped the design with the official stamp of a licensed Texas Professional Engineer, thereby taking advantage of the legal benefits and protections Texas offers to its licensed engineers.  Such a stamp is a statement by the state-sanctioned licensing body that the engineer bearing the stamp possesses a certain minimum level of competence. D. Miller was aware that StormWater required the stamp for the project to proceed.  By choosing to place the stamp on the design, D. Miller purposefully availed itself of the legal and economic benefits Texas has created by enforcing a licensing system for professional engineers.  Given that D. Miller, as an association of professional engineers, would have been aware of the significance of placing a state license stamp on an engineering design, the court concludes that D. Miller should reasonably have anticipated being haled into court in Texas if the design turned out to be flawed.  See World-Wide Volkswagen, 100 S.Ct. at 567.  Because D. Miller had minimum contacts with Texas and because this action arises out of those contacts, the court concludes that it has

-17-

specific jurisdiction over D. Miller in this action.   See ICEE
Distributors, 325 F.3d at 591.

Further establishing minimum contacts with Texas is the fact
that StormWater has presented a prima facie case that D. Miller's
negligence caused tortious injury in Texas.  StormWater has alleged
that D. Miller owed StormWater a duty to provide an adequate
design, that D. Miller failed that duty by, among other things, not
accounting for soil properties at the site, and that D. Miller's
negligence caused StormWater harm in Texas when the slopes of the
detention pond collapsed.[31]  "When a nonresident defendant commits
. . . an act outside the state that causes tortious injury within
the state, that tortious conduct amounts to sufficient minimum
contacts with the state."  Guidry, 188 F.3d at 628.  The court
concludes that StormWater's prima facie claim of negligence
supports a finding of minimum contacts.

2.   Is Assertion of Personal Jurisdiction Fair?

In order to establish personal jurisdiction over D. Miller,
StormWater must also show that the exercise of personal
jurisdiction would not offend "traditional notions of fair play and
substantial justice."  Asahi, 107 S.Ct. at 1033.  Considering the
fairness factors articulated in Asahi the court concludes that
asserting personal jurisdiction over D. Miller would be fair.

---

[31]Plaintiffs' Original Complaint, Docket Entry No. 1, ¶¶ 37-39.

Comparing the defendant's burden with the plaintiff's interest in obtaining relief, the court concludes that this balance favors resolution of this action in Texas.  Although D. Miller maintains no physical presence in Texas, its decision to place the stamp of a licensed Texas Professional Engineer on the design showed its willingness to accept both the benefits and the responsibilities of using the official stamp.  A professional license stamp may represent many things, one of which is the willingness to stand behind one's work in the state that granted the license. Furthermore, D. Miller must have been aware that if the design were defective, the physical harm from that defect would manifest itself in Texas.  While resolution of this dispute in either state will place a greater burden on one party or the other, the court concludes that D. Miller, by using the official stamp of a licensed Texas Professional Engineer, implicitly accepted the burden of defending its work in Texas.

Considering the interests of the forum state, it seems clear that Texas has a greater interest than any other state in addressing damage to Texas property resulting from negligent engineering.  Texas also has the greatest interest in addressing claims of negligence against professional engineers licensed in Texas.  Texas' interest in the competence of its licensed engineers is demonstrated by the fact that it operates a professional licensing system.  This consideration likewise addresses the fifth factor, that of the interest of states in furthering substantive

social policies; the licensing of professional engineers is a substantive social policy that Texas has a legitimate interest in overseeing. Finally, this court's assertion of personal jurisdiction over D. Miller will further the interests of the interstate judicial system in obtaining the most efficient resolution of the controversy because it will avoid a situation in which the claims and cross-claims between StormWater, Platipus, and D. Miller are addressed in separate proceedings in different states. For these reasons, the court concludes that the exercise of personal jurisdiction will not offend traditional notions of fair play and substantial justice.

**D.    Conclusion**

The court concludes that the exercise of personal jurisdiction over D. Miller comports with federal due process because D. Miller has established minimum contacts with Texas and because the exercise of jurisdiction does not offend traditional notions of fair play and substantial justice. See International Shoe, 66 S.Ct. at 158. Therefore, D. Miller's Rule 12(b)(2) motion will be denied.

## III.    D. Miller's Rule 12(b)(3) Motion

D. Miller argues in the alternative that it should be dismissed under Federal Rule of Civil Procedure 12(b)(3) because venue in the Southern District of Texas is improper. StormWater

argues that venue is proper under both 28 U.S.C. § 1391(a) and 28 U.S.C. § 1391(c).

## A.    Applicable Law

"Once a defendant raises the issue of proper venue by motion, the burden of proof is placed upon the plaintiff to sustain venue." McCaskey v. Continental Airlines, Inc., 133 F.Supp.2d 514, 523 (S.D. Tex. 2001).  In deciding whether venue is proper the court must accept facts alleged in the well-pleaded complaint as true. Id.  The court's subject matter jurisdiction in this matter is based solely upon diversity of citizenship.  In such an action, 28 U.S.C. § 1391(a) provides that venue is proper in:  "(1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred."  The venue statute also states, "(c) For purposes of venue under this chapter, a defendant that is a corporation shall be deemed to reside in any judicial district in which it is subject to personal jurisdiction at the time the action is commenced."  28 U.S.C. § 1391(c).  Section 1391(c), on its face, applies only to corporations, and it is undisputed that D. Miller is a professional association rather than a corporation.  The Supreme Court, however, has held that § 1391(c) also applies to unincorporated associations.  Denver & R.G.W.R. Co. v. Brotherhood of R.R. Trainmen, 87 S.Ct. 1746, 1750 (1967).  In addition, the Fifth

-21-

Circuit has held that the statute applies to unincorporated partnerships. <u>Penrod Drilling Co. v. Johnson</u>, 414 F.2d 1217, 1223-1225 (5th Cir. 1969), <u>cert. denied</u>, 90 S.Ct. 552 (1970).  Given these broad readings of 28 U.S.C.A. § 1391(c), it seems clear that § 1391(c) applies to professional associations as well.

## B.   Analysis

The court concludes that because this action arises from the collapse of the walls of a retaining pond in Houston, the Southern District of Texas is "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred." Venue is thus proper under 28 U.S.C. § 1391(a)(2).  Furthermore, the court has already concluded that D. Miller is subject to personal jurisdiction in Texas.  Since 28 U.S.C. § 1391(c) provides that "a defendant that is a corporation shall be deemed to reside in any judicial district in which it is subject to personal jurisdiction at the time the action is commenced," the court concludes that D. Miller resides in this district for purposes of § 1391(c), and therefore that venue is proper under § 1391(a)(1).

## IV.   <u>D. Miller's Motion to Transfer</u>

D. Miller has moved in the alternative for this action to be transferred to the United States District Court for the District of North Carolina pursuant to 28 U.S.C. §§ 1404(a) and 1406. StormWater opposes the motion.  D. Miller's argument for transfer

is perfunctory and provides no legal rationale for why transfer would be proper.

Section 1404(a) allows district courts to transfer an action to another proper venue "for the convenience of parties and witnesses" if such a transfer will be "in the interest of justice." 28 U.S.C. § 1404(a). The Fifth Circuit has noted that because a plaintiff's choice of forum should bear some weight in a transfer analysis, the movant must show "good cause" in order to obtain a transfer. Humble Oil & Ref. Co. v. Bell Marine Serv., Inc., 321 F.2d 53, 56 (5th Cir. 1963). To show "good cause" the movant must show that the desired venue is "clearly more convenient" than the venue chosen by the plaintiff:

> [W]hen the transferee venue is not clearly more convenient than the venue chosen by the plaintiff, the plaintiff's choice should be respected. When the movant demonstrates that the transferee venue is clearly more convenient, however, it has shown good cause and the district court should therefore grant the transfer. In re Volkswagen of America, Inc., 545 F.3d 304, 315 (5th Cir. 2008).

D. Miller has provided no reason to conclude that resolving this action in North Carolina would be "clearly more convenient" for the parties than resolving it in Texas. Out of the four parties involved, three have accepted venue in Texas. Physical evidence relating to the collapse of the retaining walls will be more readily accessible in Texas than in North Carolina. In the absence of any showing of good cause for transfer by D. Miller, the court concludes that the motion should be denied.

-23-

## V.   <u>Conclusion and Order</u>

For the reasons stated above, the court concludes that D. Miller's motions to dismiss under Federal Rules of Civil Procedure 12(b)(2) and 12(b)(3) are without merit.  The court furthermore concludes that D. Miller has not shown good cause for transfer of this action.  Accordingly, Defendant D. Miller's Motion to Dismiss for Lack of Personal Jurisdiction (Docket Entry No. 4) is **DENIED**.

**SIGNED** at Houston, Texas, on this 11th day of February, 2010.

SIM LAKE
UNITED STATES DISTRICT JUDGE

-24-